**TRIAD ASSOCIATES, INC., d/b/a Guardian Security, JK Guardian Security Services, Inc., and K & J Management, Inc., Plaintiffs–Appellees,**

v.

**Renault ROBINSON, Defendant–Appellant.**

No. 92–4002.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 9, 1993.

Decided Nov. 24, 1993.

Scott F. Turow (argued), Matthew D. Tanner, Sonnenschein, Nath & Rosenthal, Chicago, IL, John L. Gubbins, Monfort, WI, for plaintiffs-appellees.

Thomas E. Johnson (argued), Phillip H. Snelling, ACC, Johnson, Jones & Snelling, Anthony J. Fusco, Jr., City of Chicago Housing Authority, Chicago, IL, for defendant-appellant.

Before FLAUM and MANION, Circuit Judges, and REYNOLDS, Senior District Judge.*

FLAUM, Circuit Judge.

In this appeal, defendant below, Renault Robinson, appeals the district court's refusal to grant a motion to dismiss based on qualified immunity. We affirm.

* The Honorable John W. Reynolds, of the Eastern District of Wisconsin, sitting by designation.

## I.

From 1983 through early 1987 the defendant, Renault Robinson, was the Chairman of the Board of Commissioners of the Chicago Housing Authority (CHA). The CHA is a municipal corporation that provides housing for low income families in Chicago and is governed by a Board of Commissioners whose members are appointed by the Mayor of Chicago. The plaintiffs (collectively "Triad") are in the business of providing security and guard services, and from 1982 through 1989 the CHA engaged Triad for such security services. All of the shareholders of Triad are white individuals. This litigation centers around allegations that after Robinson's appointment as Chairman of the CHA Board by the late Mayor Harold Washington, he led the CHA in a concerted effort to replace the white owned plaintiff companies with black owned security companies. Triad asserts that this effort was both racially and politically motivated.

Triad originally filed suit in 1987, naming the CHA, Renault Robinson, and five other CHA officials, in their individual capacities, as defendants. In its seven count complaint, Triad set out various theories for relief. Three counts were based upon 42 U.S.C. § 1983, in which Triad alleged as predicates the infringement of its free association, speech, due process and equal protection rights. In a fourth count, under 42 U.S.C. § 1985(3), Triad alleged a conspiracy to deprive it of its rights to free association and equal protection. Triad also alleged civil RICO violations, and, in two counts under state law, breach of contract and tortious interference with contract.

The district court dismissed the entire complaint under Federal Rule of Civil Procedure 12(b)(6). On appeal, this Court reversed the dismissal of the § 1985(3) claim and the § 1983 claims that were based on due process and equal protection theories. *Triad Assoc., Inc. v. CHA,* 892 F.2d 583 (7th Cir.1989), *cert. denied,* 498 U.S. 845, 111 S.Ct. 129, 112 L.Ed.2d 97 (1990). Thereafter, Triad filed a five count second amended complaint in the district court reasserting the § 1985(3) and state law contract claims against the CHA and the § 1983 equal protection claim against all defendants. An additional count alleged in the alternative a violation of the corporate shareholders' equal protection rights. On a 12(b)(6) motion the district court dismissed the plaintiff shareholders' claims for lack of standing, leaving in the case only the corporate plaintiffs, and extended qualified immunity to all of the individual defendants in the case except Renault Robinson.[1] The court found that with respect to the other defendants the "complaint contains no specific allegations as to how [they] played a specific role in any illegal act." This appeal was then brought by Robinson alone and presents the sole issue of whether the district court erred in refusing to extend qualified immunity to him. For the reasons stated below, we affirm the district court's denial of qualified immunity.

## II.

■ As an initial matter, we note our jurisdiction to immediately review a denial of qualified immunity to the extent it turns on an issue of law. *See Mitchell v. Forsyth,* 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985); *Elliot v. Thomas,* 937 F.2d 338, 340–41 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 973, 117 L.Ed.2d 138 (1992). Also preliminarily, we observe that because qualified immunity was raised here in a motion to dismiss, we must take the allegations of the plaintiff's complaint as true, construing them liberally and viewing them in the light most favorable to the plaintiff. *See McMath v. City of Gary, Indiana,* 976 F.2d 1026, 1031 (7th Cir.1992). Furthermore, the allegations from the complaint are the only facts properly before us when considering an appeal of a denial of an immunity defense raised in a motion to dismiss. *See McDonald v. Haskins,* 966 F.2d 292, 292 (7th Cir.1992). And because this appeal only presents questions of law, our standard of review is *de novo. See Apostol v. Landau,* 957 F.2d 339, 342 (7th Cir.1992).

---

1. The district also held that the plaintiff corporations have standing under § 1983 and § 1985(3) to request relief for discriminatory action taken against them based on the race of their shareholders and that plaintiffs' claims were not time barred by the applicable statute of limitations.

## A.

■ The test for determining whether a public official defendant is entitled to qualified immunity is an objective one. A government official performing discretionary functions can be stripped of his shield from liability for civil damages only if his conduct violated "clearly established statutory or constitutional rights of which a reasonable person would have known" as of "the time [the] action occurred." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). While the specific conduct in question need not previously have been held unlawful, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). Thus the touchstone of a qualified immunity inquiry is the clarity of the state of the law in relation to the defendant's conduct at the time the conduct occurred.

Robinson presents two basic arguments why he should be entitled to qualified immunity. First, he argues that Triad has failed to plead specific facts that make out an equal protection violation and thus should face outright dismissal. Second, Robinson devotes the bulk of his brief to the position that even if Triad has succeeded in stating a cognizable claim under current law, Triad has failed to surmount the *Harlow* hurdle by not showing that at the time of Robinson's conduct it was

clear that a corporation could sue for discrimination against it based on the skin color of its white shareholders.

■ In making his first argument Robinson seemingly asserts that the allegations contained within Triad's complaint do not support an inference that Robinson acted with the discriminatory intent necessary to make out an equal protection claim. *See Washington v. Davis*, 426 U.S. 229, 238–48, 96 S.Ct. 2040, 2047–51, 48 L.Ed.2d 597 (1976). Although, in light of our limited jurisdiction on an appeal such as this one, it may seem curious to review plaintiff's complaint for its general sufficiency in stating a claim, determining whether a plaintiff has asserted a constitutional violation at all is "[a] necessary concomitant to the determination of [qualified immunity]." *Siegert v. Gilley*, 500 U.S. 226, ——, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991). One of the main purposes of immunity and interlocutory review of a denial of immunity is to spare public officials the cost and burden of full litigation every time an accusation of misconduct is leveled against them. Deciding as a threshold matter the "purely legal question" of whether a plaintiff has established the violation of any constitutional right at all "permits courts expeditiously to weed out suits which fail the test without requiring the defendant who rightly claims qualified immunity to engage in expensive and time consuming preparation to defend the suit on its merits." *Id.*[2]

---

**2.** In his briefs Robinson attempts to use this language from *Siegert* as a springboard for now appealing the district court's rulings on otherwise noncurrently appealable issues. Specifically, Robinson maintains that the district court erred in rejecting his claims that this action against him comes too late under the applicable statute of limitations and that Triad lacks standing to sue for racial discrimination. Because, if these arguments were accepted, Triad's entitlement to any relief would be vitiated, Robinson apparently believes that *Siegert* makes their resolution part of a qualified immunity analysis and thus immediately appealable. Normally we would not have jurisdiction to review such questions at the present stage in the litigation. Because this is an appeal of an interlocutory order, brought pursuant to 28 U.S.C. § 1291, only those parts of the order that "conclusively determine the disputed question ..., resolve an important issue completely separate from the merits of the action ... [and are] effectively unreviewable on

appeal from a final judgment" can be reviewed. *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 276, 108 S.Ct. 1133, 1136, 99 L.Ed.2d 296 (1988) (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468, 98 S.Ct. 2454, 2457, 57 L.Ed.2d 351 (1978)). Limitations issues fail the last prong of this test. *See Brown v. United States*, 851 F.2d 615, 619 (3rd Cir.1988); *Bonitz v. Fair*, 804 F.2d 164, 174 (1st Cir.1986), *overruled on other grounds, Unwin v. Campbell*, 863 F.2d 124 (1st Cir.1988). Similarly, a denial of a motion to dismiss for lack of standing does not qualify as a final judgment and thus is not eligible for review at this time. *Cf. Crymes v. DeKalb County, Ga.*, 923 F.2d 1482, 1484 (11th Cir.1991) ("It is ... clear that the district court's denial of appellants' motion to dismiss the complaint on ripeness grounds ... is not in itself an immediately appealable order."). In addition, that we have jurisdiction to review the district court's denial of qualified immunity, *see supra*, is

*Accord Wade v. Hegner,* 804 F.2d 67, 70 (7th Cir.1986) (delineating a two-part analysis under *Harlow:* "(1) does the alleged conduct set out a constitutional violation? and (2) were the constitutional standards clearly established at the time in question?").

 In undertaking such a preliminary inquiry, notwithstanding the objective character of the *Harlow* test, it is appropriate to examine the sufficiency of the allegations concerning the defendant's underlying intent when intent is a component of the complained of constitutional violation. *See Auriemma v. Rice,* 910 F.2d 1449, 1453 (7th Cir.1990) (en banc), *cert. denied,* ── U.S. ──, 111 S.Ct. 2796, 115 L.Ed.2d 970 (1991); *Rakovich v. Wade,* 850 F.2d 1180, 1210 (7th Cir.) (en banc), *cert. denied,* 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988); *Branch v. Tunnell,* 937 F.2d 1382, 1385–86 (9th Cir. 1991). And in this circuit on a motion to dismiss we require no more from plaintiffs' allegations of intent than what would satisfy Rule 8's notice pleading minimum and Rule 9(b)'s requirement that motive and intent be pleaded generally. *See Elliott v. Thomas,* 937 F.2d 338, 345 (7th Cir.1991), *cert. denied,* ── U.S. ──, 112 S.Ct. 973, 117 L.Ed.2d 138 (1992). *Contra Branch,* 937 F.2d at 1386 (adopting a "heightened pleading standard in [qualified immunity] cases in which subjective intent is an element of a constitutional tort action" and holding that "in order to survive a motion to dismiss, plaintiffs must state in their complaint nonconclusory allegations setting forth evidence of unlawful intent"). In qualified immunity cases there is no special pleading standard that need be satisfied to survive a motion to dismiss. "A possibility that the defendants will claim immunity does not require the plaintiffs to anticipate and plead around that defense." *Elliott,* 937 F.2d at 345.[3]

 In any event, examining Triad's complaint we find that the allegations not only directly state but also fully support an inference that Robinson intended to discrimi-

---

not sufficient to confer on us jurisdiction to review other claims presented to the district court. Otherwise nonappealable issues cannot be bootstrapped to an appealable question. *See Abney v. United States,* 431 U.S. 651, 663, 97 S.Ct. 2034, 2042, 52 L.Ed.2d 651 (1977).

Robinson's contention that *Siegert* changes all this by collapsing such preliminary questions into the qualified immunity inquiry is without support. What Robinson misapprehends or elects not to address is that *Siegert* does not represent a wholesale evisceration of the final judgment rule whenever qualified immunity is raised as a defense. Rather *Siegert,* and this Circuit's analytical approach to qualified immunity as set out in *Wade,* only indicate that determining that alleged conduct does not establish a prima facie constitutional claim serves as a logical shortcut to finding that the alleged conduct did not violate clearly established constitutional standards. (Of course, the logic of this approach would be completely rigorous if the examination were to focus. on the sufficiency of constitutional claim under the law as it was at the time of the conduct.) Standing and limitations issues do not bear on the facial validity of § 1983 claim and thus do not warrant examination on review of a qualified immunity denial.

At various points in his briefs Robinson resists the characterization of whether Triad can sue for racial discrimination as an issue of standing, casting the question instead as an issue of the reach of the federal right. If Robinson's contention were correct, then *Siegert* very well could indicate that it would be proper to consider that issue on the merits now. However, because, as discussed *infra,* we feel that the question of whether a white owned corporation can bring a race discrimination claim is a matter of prudential standing and does not bear on the existence of a viable § 1983 cause of action, an inquiry into Triad's ability to currently bring such a claim is not one that is properly embarked upon in this appeal from a denial of qualified immunity.

To further beat the jurisdictional dead horse, we do not find that these collateral issues are "inextricably entwined" with the appealable qualified immunity inquiry nor that there are "compelling reasons" for not deferring the limitations questions until the end of the lawsuit that would justify invoking our rarely appropriate pendent appellate jurisdiction. *U.S. for Use of Valders Stone & Marble, Inc. v. C–Way Const. Co.,* 909 F.2d 259, 262 (7th Cir.1990).

3. What *Elliott* does establish is that to defeat a motion for *summary judgment* based on qualified immunity a plaintiff must submit a "minimum quantum of proof" that the defendant acted with the requisite intent. *Id.* at 345. At the summary judgment stage, the interest expressed in *Harlow* of sparing public officials the rigors of discovery when they still may be entitled to immunity can be served in a fair manner by requiring plaintiffs to meet an immunity challenge by coming forward with more particularized evidence of subjective intent before the case is allowed to proceed any further. However, no such requirement arises any earlier in the litigation and certainly not before the filing of the complaint.

nate on the basis of race.[4] Triad has alleged, for example, that it has performed competently, that Robinson knew it was white owned, that Robinson terminated Triad's services at some CHA sites, and that he participated both in paying Triad more slowly than black owned firms and in awarding security work to black owned firms after refusing to award a competitively bid contract to Triad in spite of the recommendation of the CHA Executive Director. Further, Triad has alleged that Robinson also participated in modifying bid specifications to levels at which black owned firms could qualify. Triad has also asserted that Robinson issued false statements associating it with a white alderman allegedly unpopular in the black community.

■ Robinson argues that none of these incidents standing alone can support the inference that he intended to racially discriminate against Triad. A court's duty, however, is to consider a complaint *as a whole*. *See DeMallory v. Cullen*, 855 F.2d 442, 445 (7th Cir.1988). Looking at the allegations of Triad's complaint and their combined significance, we feel that even if Triad needed to satisfy a heightened pleading standard—and we repeat that it does not—there is ample

basis here from which to infer a racial animus. *See Elliott*, 937 F.2d at 345–46.

### B.

■ This brings us to the heart of the appeal. Robinson argues vigorously that, even if the complaint is sufficient in its allegations of intentional discrimination, a white owned corporation's ability to bring a § 1983 race discrimination suit was not clearly established at the time of the conduct in question. Therefore, a reasonable public official in his position would not have expected to be haled into court because of discriminatory action taken against such a corporation. Thus, Robinson reasons, the plaintiffs have failed to satisfy the *Harlow* test, and he should not be denied protective immunity.

We reject this argument as flawed in its inception and therefore need not resolve whether its linchpin, that it would not have been clear to a reasonable official in his position that a corporation could bring a discrimination suit,[5] is correct. Instead we find persuasive this Court's reasoning in *Kurowski v. Krajewski*, 848 F.2d 767 (7th Cir.), *cert. denied* 488 U.S. 926, 109 S.Ct. 309, 102 L.Ed.2d 328 (1988), and hold that uncertainty

4. Triad points out that Robinson failed to argue in the district court that he was entitled to qualified immunity based on his lack of discriminatory intent and therefore argues that he should not be allowed to raise that issue for the first time here. While we indeed could find no reference to this tack in Robinson's briefs below, the district court did find that "[t]he plaintiffs have produced specific factual allegations in their complaint for actions taken by ... Robinson." Memorandum Opinion at 11. Because the district court did seem to consider the sufficiency of the allegations against Robinson and since we agree with Triad on the merits of this issue, we will not pause to decide whether Robinson's neglect to specifically raise a particular basis for qualified immunity in the district court should constitute a waiver of that argument.

5. Robinson also argues that even today a corporation cannot bring a § 1983 discrimination claim. He finds support for this position from Supreme Court dicta in *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977): "As a corporation, MHDC has no racial identity and cannot be the direct target of the petitioners' alleged discrimination." *Id.* at 263, 97 S.Ct. at 562. Robinson incorrectly states that the Court denied standing to the plain-

tiff corporation on this ground. In fact, the Court did "not decide whether the circumstances of this case would justify ... permit[ting] MHDC to assert the constitutional rights of its prospective minority tenants" because in the case there was "one individual plaintiff who has demonstrated standing to assert these rights as his own." *Id.* at 263–64, 97 S.Ct. at 562–63. And in *Gersman v. Group Health Ass'n, Inc.*, 931 F.2d 1565 (D.C.Cir.1991), *vacated on other grounds,* — U.S. —, 112 S.Ct. 960, 117 L.Ed.2d 127, *reinstated* 975 F.2d 886 (1992), the D.C. Circuit held that a plaintiff corporation had standing to sue for injury it suffered from discrimination against it because its president and owners were Jewish. The court declined to delve into the difficult determination of "whether a corporation can in fact have a racial identity," instead finding that as a prudential matter a corporation that is harmed by discriminatory action taken against it has standing to litigate that harm. *Id.* at 1569. Sensing that *Gersman* is fatal to his position, Robinson argues vehemently that it was wrongly decided. However, because of our limited jurisdiction on this appeal, *see supra* note 2, we do not address the merits of this question today.

as to the eventual plaintiff's standing to bring suit, no matter how objectively reasonable at the time of the conduct in question, cannot be the basis for qualified immunity.

*Kurowski* involved a § 1983 suit against a state court judge brought by former public defenders who alleged that they were fired by the judge on the basis of their politics in violation of their First Amendment rights. The defendant asserted that he should be entitled to qualified immunity, arguing that at the time of his conduct the law failed to clearly establish that a judge's absolute immunity does not extend to hiring and firing decisions. Because it would not have been clear to a reasonable judge at the time that such actions could render him liable, the defendant concluded that he was entitled to enjoy the shelter of qualified immunity. The court rejected this argument noting that "[r]ules without judicial sanction are rules just the same." *Id.* at 774. A defendant's good fortune of being spared the consequences that federal courts usually mete out for illegal conduct does not in any way affect the fact that such conduct is illegal. Whatever protection from a judicial assessment of liability the special doctrine of absolute immunity could have provided the judge in *Kurowski*,[6] it would never place an imprimatur of approval on a clear infringement of First Amendment rights.

■ Robinson's argument is a similar attempt to gloss over a what is a fundamental distinction in our jurisprudence, the distinction between right and remedy.[7] There are rules of law, many of them clearly established, whose violations in particular cases are simply not suited for vindication. Even if the illegal nature of certain conduct is clear, other institutional concerns will some-

times operate to preclude particular individuals from obtaining relief. For example, courts will not resolve cases requiring the resolution of political questions, *see Gilligan v. Morgan,* 413 U.S. 1, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973), nor cases that necessitate the determination of the validity of an act of a foreign state, *see Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964). To an aggrieved party a right without a remedy is doubtlessly not much better than no right at all. And in that practical sense, the right/remedy distinction can grow abstract. But its validity and usefulness become manifest precisely in a case like this one. Qualified immunity works to cut off what often would otherwise be legitimate calls for redress. We embrace this doctrine because, by providing some breathing room, it serves the essential function of facilitating public officials in the performance of their lawful duties. Through the doctrine, our jurisprudence seeks to encourage lawful official conduct in a manner short of complete abdication to governmental prerogative. Because qualified immunity represents an attempt at systemic maximization of legitimate official conduct, the availability of a remedy to a particular plaintiff should not be of critical moment in an immunity analysis. We want officials to act lawfully whether or not the circumstances of a given case work to reduce accountability.[8] *Kurowski* makes clear that a distinction exists in the law, and should exist in the heads of reasonable public officials, between the legality of conduct and the ability of a putative plaintiff to achieve redress for such conduct. Accordingly, the appropriate focus in a qualified immunity analysis is the legality of the conduct of the public official, not the obviousness of his liability to the ultimate plaintiff.[9] Im-

---

6. As this court noted, "[t]he legislature could impeach and remove Judge Krajewski from office for violating the Constitution, or the Supreme Court of Indiana impose intrabranch discipline, whether or not federal judges are prepared to extract damages." *Kurowski,* 848 F.2d at 774.

7. Robinson stridently (and incorrectly) asserts that this portion of the *Kurowski* opinion was dicta. Even if that were true, it is the reasoning, not the holding, of *Kurowski* which is applicable here.

8. In this spirit, we observed in *Kurowski,* "[i]f Judge Krajewski thought that judicial immunity would allow him to get away with a violation of the Constitution, this expectation—factually reasonable though it may have been—is not one the judicial system is prepared to recognize as legitimate." *Kurowski,* 848 F.2d at 775.

9. The Supreme Court's holding in *Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984), that qualified immunity can only be lost if the law upon whose clear violation the denial of immunity is to be based is the law sued upon and

plicit in the structure of the *Harlow* ruling itself is this essential point: "Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate; and a person who suffers injury caused by such conduct *may* have a cause of action." *Harlow v. Fitzgerald,* 457 U.S. 800, 821, 102 S.Ct. 2727, 2740, 73 L.Ed.2d 396 (1982) (emphasis added).

Furthermore, Triad's ability to assert a § 1983 discrimination claim under the facts of this case is not a question of the scope of the underlying substantive right. That was fixed by the Equal Protection Clause's guaranty that government action will not be taken on the basis of race. Except under narrow circumstances,[10] governmental disregard of the fundamental dictate of equal treatment is the beginning and end of the equal protection inquiry. Whether a particular entity that feels the *effect* of such action is entitled to judicial relief is a classic issue of standing, *see, e.g., Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 260–61, 97 S.Ct. 555, 560–61, 50 L.Ed.2d 450 (1977), and, as discussed above, is therefore not relevant to a qualified immunity analysis.

Nothing in this Court's opinion in *Auriemma* is to the contrary. There we held that the defendant was entitled to qualified immunity with respect to a 42 U.S.C. § 1985(3) claim because it was not clearly established at the time of his conduct that whites as a class came within the protection of the statute. *See Auriemma,* 910 F.2d at 1458–59. § 1985(3) provides a cause of action when "two or more persons ... conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving ... any person or class of persons of the equal protection of the laws...." We found that it was reasonable to believe, at least prior to

our decision in *Triad Assocs., Inc. v. Chicago Housing Auth.,* 892 F.2d 583 (7th Cir.1989), that the § 1985(3) "equal protection" right was intended only to protect black citizens. Here, by contrast, the operative equal protection right derives from the Fourteenth Amendment and undoubtedly protects all citizens against race-based discrimination. *See Regents of University of California v. Bakke,* 438 U.S. 265, 289–90, 98 S.Ct. 2733, 2747–48, 57 L.Ed.2d 750 (opinion of Justice Powell). In this case, unlike *Auriemma,* there is no question that it is unlawful to discriminate against whites under the applicable rule of law. The only issue before us is whether Triad is an appropriate party to seek relief for such alleged discrimination. This is the essence of standing. And we again emphasize that public officials who conduct themselves in clear contravention of the command of the law do so at their own risk, regardless of the vagaries of the contemporaneous law of standing.

### III.

For the foregoing reasons the judgment of the district court is

AFFIRMED.

---

not some other statute or regulation, does not indicate otherwise. The Court's reluctance to enmesh the federal courts in "extensive inquir[ies]" into the meaning, purpose, importance and applicability of state administrative regulations and hold public officials accountable for such an understanding that "often eludes even trained lawyers with full access to the relevant legislative or administrative materials," *id.* at 196–97 & n. 13, 104 S.Ct. at 3020 & n. 13, did

not signal a retreat from the principles of *Harlow. See id.* at 194–95, 104 S.Ct. at 3019.

10. For example, an affirmative action program narrowly tailored to remedy the effects of past discrimination can be a basis for preferential treatment according to race. *See City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989).