**Michael J. FRANE and Deborah M. Frane, Plaintiffs,**

v.

**Michael KIJOWSKI; Anthony Simpson; Kevin Cahill; Tammy Kreibach; Jerald R. Bleck; and TRI–COM, an intergovernmental agency of the Cities of Batavia, Illinois; St. Charles, Illinois, and Geneva, Illinois, Defendants.**

No. 97 C 0504.

United States District Court, N.D. Illinois, Eastern Division.

Jan. 27, 1998.

---

Joseph P. Condon, Condon & Zopp, Ltd., Crystal Lake, IL, for Michael J. Frane and Deborah M. Frane.

James Gus Sotos, Jason W. Rose, Michael D. Bersani, Hervas, Sotos & Condon, P.C., Itasca, IL, James Constantine Vlahakis, Hernas, Sotos, Longdon & Bersani, Itasca, IL, for Michael Kijowski, Anthony Simpson, Kevin Cahill and City of St. Charles, Illinois.

Steven M. Puiszis, Michael S. Nardulli, Hinshaw & Culbertson, Chicago, IL, for Tammy Kreibach, Jerald R. Bleck and TRI–COM.

## MEMORANDUM OPINION AND ORDER

LEINENWEBER, District Judge.

Plaintiffs Michael and Deborah Frane (the "Franes") sue three St. Charles police officers, TRI–COM, an intergovernmental agency that operates a 911 emergency telephone system, and two of TRI–COM's employees seeking damages under 42 U.S.C. § 1983 for violations of their constitutional rights. Plaintiffs additionally allege common law violations by Officer Michael Kijowski.

### BACKGROUND

The events giving rise to this suit transpired within a short period of time early on the morning of January 27, 1996. At approximately 1:54 a.m., Danielle Frane, plaintiffs' 17 year-old daughter, made a 911 call that was received by TRI–COM, an intergovernmental agency providing emergency phone dispatch services to the residents of St. Charles, Batavia and Geneva, Illinois. TRI–COM dispatcher Tammy Kreibach ("Kreibach") answered the phone call. Danielle Frane told the dispatcher that her parents had been arguing. She asked for the police to be dispatched to her house because her father was drunk and was beating up her mother.

After Kreibach dispatched police officers to the Frane residence, she remained on the phone with Danielle Frane. Kreibach reassured Danielle Frane that she was safe, and instructed her to remain where she was—in an upstairs bedroom at the back of the house—and not to go down to the first floor where her parents were located. On three occasions, Kreibach asked Danielle Frane if she had any knowledge of whether her father had a weapon in the house and Danielle Frane responded each time that she did not know. During the course of the conversation, Danielle Frane stated that she could not hear very well because the radio was being played in the kitchen. Then, at 1:57 a.m., the following exchange occurred between Danielle Frane and Tammy Kreibach:

"Caller: I'm upstairs, I can't really hear anything. (Pause of several seconds). I think he's playing with my dart gun.

*1:57:38 a.m.*

Dispatcher: What kind of dart gun is this?

Caller: It's um, it's just a Wal–Mart–like air pistol.

Dispatcher: Okay, like a BB gun, or . . .

Caller: Yeah.

Dispatcher: Okay."

Kreibach failed to communicate this information to any of the officers at the scene.

Meanwhile, a second dispatcher began communicating with the police officers who were dispatched to the scene. Officers Kevin Cahill, Michael Kijowski, and Anthony Simpson arrived at the scene at 1:57 a.m., 1:58 a.m. and 1:59 a.m., respectively. The police officers walked around the outside of the Frane residence surveying the area. When the officers looked through the kitchen window, located at the rear of the house, they observed Michael Frane pointing what appeared to be a gun at the head of his wife, Deborah Frane. Deborah Frane was seated at a kitchen table smoking a cigarette with a cup of coffee in front of her.

At 2:00:28 a.m., Officer Simpson reported to TRI–COM that the situation involved "a man with a gun." The second dispatcher at TRI–COM acknowledged the information. Approximately six seconds later, Officer Kijowski fired his weapon three times through the closed window. The bullets broke through the kitchen window, striking Michael Frane in the head and hip, injuring him and damaging property within the residence. Prior to shooting, the officers never identified themselves as police, or gave a warning. When the three officers forced open the door to the kitchen, they discovered that the gun Michael Frane was holding was actually a BB gun.

Plaintiffs have filed a seven-count complaint pursuant to 42 U.S.C. § 1983 and Illinois common law. In Count I, plaintiffs allege that Officer Kijowski deprived Michael Frane of his rights under the Fourth, Fifth and Fourteenth Amendments. In Count III, Michael Frane alleges that Officers Simpson and Cahill violated his constitutional rights by failing to intervene in the shooting. In Count IV, Michael Frane additionally alleges that Tammy Kreibach, her supervisor, Jerald

Bleck, and TRI–COM deprived him of his constitutional rights in violation of 42 U.S.C. § 1983. In Count VI, Deborah Frane alleges that Officer Kijowski violated her rights. Finally, in Counts II and VII, plaintiffs bring pendant state law claims for battery and willful and wanton misconduct against Officer Kijowski.

Defendants Kijowski, Simpson and Cahill move to dismiss portions of the amended complaint and defendants Kreibach, Bleck and TRI–COM move for summary judgment on Counts IV and V of plaintiffs' amended complaint. For the reasons discussed below, the court grants both motions.

### *KIJOWSKI, CAHILL AND SIMPSON'S MOTION TO DISMISS*

In ruling on the police officers' motion to dismiss, the court adheres to the familiar standard of viewing the complaint in the light most favorable to plaintiff. Consequently, the court accepts all well-pleaded allegations as true and draws all reasonable inferences in favor of the plaintiff. *Antonelli v. Sheahan,* 81 F.3d 1422, 1427 (7th Cir.1996); *Codest Engineering v. Hyatt Int'l Corp.,* 954 F.Supp. 1224, 1232 (N.D.Ill.1996). The court will only dismiss a complaint for failure to state a claim if no relief may be granted under any set of facts that could be proven consistent with the allegations found in the complaint. *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984). While the court has additional evidence through defendant Kreibach, Bleck and TRI–COM's summary judgment motion, in ruling on the motion to dismiss, the court confines its inquiry to the pleadings.

#### *Qualified Immunity*

■ Officers Kijowski, Cahill and Simpson argue that they enjoy qualified immunity based on the allegations in plaintiffs' amended complaint, which alleges that the police officers violated Michael Frane's Fourth, Fifth and Fourteenth Amendment rights. Under the doctrine of qualified immunity, "governmental officials performing discretionary functions are shielded from liability for civil damages insofar as their conduct

does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The doctrine "is intended to provide government officials with the ability 'reasonably [to] anticipate when their conduct may give rise to liability for damages.'" *Anderson v. Creighton,* 483 U.S. 635, 646, 107 S.Ct. 3034, 3042, 97 L.Ed.2d 523 (1987) (quoting *Davis v. Scherer,* 468 U.S. 183, 195, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984)). Viewed in its entirety, the defense presents a substantial barrier for plaintiffs since it is "designed to shield from civil immunity 'all but the plainly incompetent or those who knowingly violate the law.'" *Donovan v. City of Milwaukee,* 17 F.3d 944, 951 (7th Cir.1994) (citations omitted).

■ The determination of whether public officials are entitled to qualified immunity is an objective one. *Triad Assoc., Inc. v. Robinson,* 10 F.3d 492, 496 (7th Cir.1993). Once a defendant has asserted a defense of qualified immunity, courts ask: 1) whether the alleged conduct violated a specific constitutional right; and 2) whether constitutional standards were clearly established at the time in question. *Kernats v. O'Sullivan,* 35 F.3d 1171, 1176 (7th Cir.1994). Plaintiff bears the burden of establishing the existence of a clearly established constitutional right. *Rakovich v. Wade,* 850 F.2d 1180, 1209 (7th Cir.1988). "[T]he contours of the [constitutional] right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right" at the time of the incident. *Anderson,* 483 U.S. at 639–640, 107 S.Ct. at 3038–39.

■ As a preliminary matter, defendants assert that plaintiffs' claims against the police officers in their official capacities should be dismissed. A suit against the police officers in their official capacities operates as a suit against the governmental entity and a constitutional tort against a municipal entity will not lie unless the tort is caused by a municipal policy, custom or practice. *Monell v. Dept. of Social Serv.,* 436 U.S. 658, 690–691, 98 S.Ct. 2018, 2035–2036, 56 L.Ed.2d 611 (1978). Therefore, the court dismisses all claims against the police officers in their official capacities.

■ Furthermore, plaintiffs concede that although their complaint alleges violations of their due process rights, the conduct of the police officers should be analyzed under the Fourth Amendment, not under the due process standard. Pls.' Answer to Mot. to Dismiss, ¶ 5; *See, Graham v. Connor,* 490 U.S. 386, 394, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989) (claims that law enforcement officials have used excessive force in the course of arrest, investigatory stop or other "seizure" of a person are properly analyzed under the 4th Amendment). Thus, the court will disregard all references to the Fifth and Fourteenth Amendments in the complaint, and analyze the conduct of the police officers under the Fourth Amendment.

■ Apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment. *Tennessee v. Garner,* 471 U.S. 1, 6, 105 S.Ct. 1694, 1698, 85 L.Ed.2d 1 (1985). In determining the constitutionality of a particular seizure, the court must weigh "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Id.* at 8, 105 S.Ct. at 1699 (quoting *United States v. Place,* 462 U.S. 696, 703, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983)).

■ The reasonableness inquiry is an objective one, where the court considers the officers' actions in light of the facts and circumstances confronting them. *Graham,* 490 U.S. at 394, 109 S.Ct. at 1871. This determination must be made with reference to the circumstances known and information available to the officers at the scene, "rather than with 20/20 hindsight." *Id.* at 396, 109 S.Ct. at 1872.

■ Assuming the truth of all of the allegations in the complaint, the court finds that Officer Kijowski acted reasonably in shooting Michael Frane. When the officers arrived at the Frane residence in response to a call regarding a domestic dispute, they were confronted with a scene in which Michael Frane's conduct posed an immediate threat

of serious physical harm to his wife. The officers had no reason to doubt that Michael Frane was wielding a fully loaded gun; they were not advised that Michael Frane may be holding a BB gun or a dart gun. Indeed, Officer Simpson reported to TRI–COM that the situation involved a man with a gun. Consequently, the officers reasonably perceived Deborah Frane's life to be in danger.

Plaintiffs assert, however, that Deborah Frane was not in distress when the police officers arrived on the scene. She sat at the kitchen table smoking a cigarette and drinking a cup of coffee and did not show any sign of being beaten. To begin, whether Deborah Frane subjectively feared for her safety is not material. "Subjective thought processes are not relevant to the court's inquiry" in a Fourth Amendment excessive force claim. *Liebenstein v. Crowe,* 826 F.Supp. 1174, 1184 (E.D.Wis.1992). Even if Deborah Frane was calm and did not consider herself to be in danger, the scenario at hand fully justifies a reasonable officer's perception that she was in danger. From the single fact that Michael Frane was pointing a pistol at Deborah Frane's head, the police officers had ample reason to conclude that he posed a serious threat of physical harm to his wife. Finally, the speed with which the police officers had to react to the situation before them supports the reasonableness of their response. *See Graham,* 490 U.S. at 390–97, 109 S.Ct. at 1871–72 (emphasizing that officers often have to decide to use force instantaneously); *Sherrod v. Berry,* 856 F.2d 802, 805 (7th Cir.1988)(en banc) ("courts and juries must determine the propriety of the officer's actions based upon a thorough review of the knowledge, facts and circumstances known to the officer at the time he exercised his split-second judgement as to whether the use of deadly force was warranted").

Plaintiffs present several other arguments in support of their allegation that the conduct of the police officers violated the Fourth Amendment. First, plaintiffs argue that it was constitutionally unreasonable for the police officers to peek through the windows of the Frane home. The court disagrees. As the Supreme Court stated in *Mincey v. Arizona,* "the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid." 437 U.S. 385, 392, 98 S.Ct. 2408, 2413, 57 L.Ed.2d 290 (1978). Exigent circumstances justify a warrantless entry or search of a home. *Payton v. New York,* 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980); *see also United States v. Barone,* 330 F.2d 543, 545 (2d Cir. 1964) ("[t]he right of police officers to enter and investigate in an emergency is inherent in the very nature of their duties as peace officers"). In the instant case, the police officers responded to a domestic battery call and, consequently, were justified in conducting a limited search of the premises.

Plaintiffs additionally argue that the officers should have knocked and announced their presence at the scene or at least have given a warning before using deadly force. Although the knock-and-announce principle is an element of the reasonableness inquiry, "law enforcement interests may also establish the reasonableness of an unannounced entry." *Wilson v. Arkansas,* 514 U.S. 927, 115 S.Ct. 1914, 1919, 131 L.Ed.2d 976 (1995). When exigent circumstances exist, such as danger of physical injury to the police or others, an officer is excused from announcing his presence. *People v. Ouellette,* 78 Ill.2d 511, 36 Ill.Dec. 666, 668, 401 N.E.2d 507, 510 (1979). The court finds that the officers' perception that Michael Frane was holding a gun to his wife's head qualifies as an exigent circumstance, justifying the failure to knock and announce.

Similarly, the court finds the officers' decision not to warn before Officer Kijowski began shooting to be reasonable. In *Garner,* the Supreme Court held that an officer should deliver a warning "where feasible" before using deadly force. 471 U.S. at 11–12, 105 S.Ct. at 1701–02. Since a warning may have aggravated the dangerous situation, it was not feasible for the officers to warn before shooting. *See Maravilla v. United States,* 867 F.Supp. 1363, 1378 (N.D.Ind. 1994) ("warning not required when the next second could bring death to the suspect's target").

■■■ Plaintiffs also argue that the deadly force used by Officer Kijowski was excessive. A claim that officers used excessive force is also analyzed under the "objective reasonableness" standard. *Graham,* 490 U.S. at 397, 109 S.Ct. at 1872. A police officer may use deadly force when the officer has probable cause to believe that the suspect poses an immediate threat of serious physical harm either to himself or to others. *Garner,* 471 U.S. at 12, 105 S.Ct. at 1701. In answering the question of how much force is "objectively reasonable," courts look to the totality of circumstances, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of officers or others." *Graham,* 490 U.S. at 396, 109 S.Ct. at 1872.

■■■ The court does not find the use of deadly force to be excessive in this situation. It appeared to the police officers that Michael Frane posed a serious threat to the safety of Deborah Frane. The officers had to act quickly and they made a split-second decision to shoot Michael Frane through the window and terminate the threat posed by Frane. "The Fourth Amendment does not require officers to wait until a suspect shoots to confirm that a serious threat of harm exists." *Elliott v. Leavitt,* 99 F.3d 640, 643 (4th Cir.1996). Neither is the court persuaded that the fact that Officer Kijowski fired three shots indicates that the force used was excessive. *Id.* ("number of shots fired by itself cannot be determinative of whether the force used was reasonable"). It is not the role of the court to second-guess the officer's judgment, which was made in the heat of the moment, but only to consider the circumstances through the immediate perspective of a reasonable officer on the scene. *See Graham,* 490 U.S. at 396, 109 S.Ct. at 1872 ("calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation"). The court finds no basis for a post-hoc judgment that Kijowski used excessive force.

### Failure to Intervene

■■■ Count III of the complaint alleges that Officers Cahill and Simpson violated plaintiffs' constitutional rights by failing to intervene in the shooting. An officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force may violate the Fourth Amendment by his nonfeasance. *See Gaudreault v. Municipality of Salem, Mass.,* 923 F.2d 203, 207 n. 3 (1st Cir.1990). However, since the court has found that Officer Kijowski did not violate the Fourth Amendment, Officers Simpson and Cahill are also not liable. Thus, Count III of the complaint is dismissed.

### KREIBACH, BLECK AND TRI–COM'S MOTION FOR SUMMARY JUDGMENT

The court now turns to defendants Kreibach, Bleck and Tri–Com's motion for summary judgment. According to Rule 56(c), a court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). There is no genuine issue of material fact if "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Thus, if the nonmoving party could not prevail on its version of the facts, a trial is unnecessary and summary judgment should be granted. *Id.* However, the party moving for summary judgment bears the initial burden of proving the absence of a disputed material issue of fact and establishing its right to judgment as a matter of law. *NLFC, Inc. v. Devcom Mid–America, Inc.,* 45 F.3d 231, 234 (7th Cir.), *cert. denied,* 515 U.S. 1104, 115 S.Ct. 2249, 132 L.Ed.2d 257 (1995). "[A] scintilla of evidence in support of the non-movant's position is insufficient to successfully oppose summary judgment; there must be evidence on which a jury could

reasonably find for the plaintiff." *Lawshe v. Simpson,* 16 F.3d 1475, 1477 (7th Cir.1994).

## I. Claims against defendants in their individual capacity

The crux of plaintiffs' claims against dispatcher Tammy Kreibach is that her failure to inform the police officers at the scene that Michael Frane may be wielding a dart gun, in lieu of a real pistol, resulted in injury to the Franes. Specifically, plaintiffs allege that Kreibach's "refusal to communicate information known to her to officers on the scene concerning the nature of the instrument in the hand of Michael J. Frane deprived him of due process of law and the right to be free from the excessive use of force." Compl. ¶ 47(B).

▆▆▆ In response, Kreibach argues, *inter alia,* that she cannot be held liable for Michael Frane's injuries because she was not at the scene of the occurrence and, consequently, did not have a realistic opportunity to intervene and prevent injury to Michael Frane. "An individual cannot be held liable in a Section 1983 action unless he caused or participated in an alleged constitutional deprivation." *Wolf–Lillie v. Sonquist,* 699 F.2d 864, 869 (7th Cir.1983). A "causal connection, or an affirmative link" must exist between the deprivation and defendant's conduct. *Id.; Rascon v. Hardiman,* 803 F.2d 269, 273 (7th Cir.1986); *Pilachowski v. Sheahan,* No. 95 c 2958, 1996 WL 272522, *2 (N.D.Ill. May 17, 1996). "[A]n official satisfies the personal responsibility requirement of section 1983 if she acts or fails to act with a deliberate or reckless disregard of plaintiff's constitutional rights, or if the conduct causing the deprivation occurs at her direction or with her knowledge and consent." *Smith v. Rowe,* 761 F.2d 360, 369 (7th Cir. 1985); *see also Rascon,* 803 F.2d at 273–74.

▆▆ In the instant case, a critical element of causation is missing—plaintiffs fail to link Kreibach to the alleged constitutional deprivation. Defendant, herself, was not at the Frane residence. As such, plaintiffs must demonstrate that Kreibach's conduct, in some manner, caused the police officers to inflict injury on Michael Frane. The conduct at issue is actually a failure to act, that is, a failure to communicate the information provided by Danielle Frane to the police officers. Although "[o]missions as well as actions may violate civil rights" and "under certain circumstances a state actor's failure to intervene renders him or her culpable under Section 1983," *Yang v. Hardin,* 37 F.3d 282, 285 (7th Cir.1994), the defendant still needs to be personally involved in causing the constitutional deprivation.

Kreibach was not personally responsible for the alleged constitutional deprivations. Her knowledge of the scene came from Danielle Frane's account. She did not know that Michael Frane was wielding what looked like a .45 caliber pistol until one of the officers reported the situation involved a man with a gun. Only six seconds later Officer Kijowski fired the shots through the window of the Frane residence. With events developing this rapidly, it is unlikely that Kreibach had a realistic opportunity to prevent the officers from shooting. Further, Kreibach was not in direct communication with the officers—she had no advance warning that the officers were going to shoot. Clearly, the shooting did not take place with her consent. In short, Kreibach did not know of, discuss, or consent to the officers' actions. Plaintiffs have failed to show an "affirmative link" between Kreibach's conduct and Michael Frane's injuries.

Moreover, Kreibach did not act with deliberate disregard for Michael Frane's constitutional rights. As previously stated, Kreibach's knowledge of the circumstances confronting the police officers came from Danielle Frane's account, and, as a result, her knowledge of events was clearly incomplete. She did not see what the police officers saw. It is undisputed that Kreibach did not know that the dart gun at issue closely resembled a .45 caliber pistol. As defendants note, Danielle Frane's reference to a dart gun might reasonably conjure up an image of a brightly colored toy. Significantly, Kreibach also did not know that Michael Frane was pointing the gun at Deborah Frane's head. Clearly, Kreibach did not have sufficient information to appreciate the risk to Michael Frane's life as a result of her not relaying the information regarding

the dart gun. Although her failure to communicate instantly to the police officers the statement about the BB gun was part of a tragic sequence of events, Kreibach did not act with deliberate disregard for Michael Frane's life, so as to subject her to individual liability.

 Plaintiffs' allegations against Jerald Bleck also fail. Plaintiffs allege that Bleck's inadequate training and supervision of Kreibach resulted in violations of Michael Frane's constitutional rights. However, without evidence of direct responsibility for a constitutional violation, liability will not attach against a supervisory official. *Wolf–Lillie*, 699 F.2d at 869. Additionally, supervisors and others in authority cannot be held liable for any alleged wrongdoing on the part of subordinates pursuant to the doctrine of respondeat superior, since the doctrine does not apply in Section 1983 actions. *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988). As director of TRI–COM, Bleck supervises the dispatchers at TRI–COM, oversees its operations, and is familiar with its practices, customs and policies. However, there is no evidence that Bleck had any involvement in the incident at issue. It is undisputed that on the morning of January 27, 1996, Bleck was not working and therefore, was not supervising the emergency telephone operators who were working that day. Neither is there any indication that had Bleck trained Kreibach differently, this would have affected the events in question. Thus, plaintiffs do not state a viable claim against Jerald Bleck.

## II. Claims Against Defendants in their Official Capacity

 Plaintiffs also seek to hold defendants Kreibach and Bleck liable in their official capacities. However, a municipality cannot be held vicariously liable for a constitutional violation under a theory of respondeat superior. *Monell*, 436 U.S. at 691, 98 S.Ct. at 2036; *Rascon*, 803 F.2d at 274. Suits against government officers in their official capacities are merely another form of suit against the governmental entity itself. *Id.* at 690 n. 55, 98 S.Ct. at 2035 n. 55. Under *Monell*, to prevail on a claim against a municipality, plaintiff must show that (1) he or she has suffered a deprivation of a constitutionally protected interest; and, (2) the deprivation was caused by an official policy, custom or usage. *Id.*

In Count VI, plaintiffs allege that TRI–COM's "inadequate training, supervision and policies of the intergovernmental agency" resulted in the deprivation of Michael Frane's constitutional rights. Compl. ¶ 51 A,B. Specifically, plaintiffs point to TRI–COM's written operations manual regarding domestic disturbances, which provides that dispatchers should "always ask the caller if anyone has any weapons and if anyone has been drinking," but fails to instruct the dispatcher to communicate this information to the officers at the scene. According to plaintiffs, this deficiency in the manual, and the concomitant inadequate training of dispatchers, caused Michael Frane's injuries.

 However, a municipality cannot be held liable where there exists no underlying violation by its personnel. *Los Angeles v. Heller*, 475 U.S. 796, 799–800, 106 S.Ct. 1571, 1573, 89 L.Ed.2d 806 (1986) (damages not available against municipality where jury has concluded that its officers inflicted no constitutional harm); *Tom v. Voida*, 963 F.2d 952, 962 (7th Cir.1992) (same). Since the court has concluded that neither the police officers nor TRI–COM personnel violated Michael Frane's constitutional rights, plaintiffs cannot maintain a custom or policy claim against the municipality.

 Further, even if the court had found that constitutional violations occurred, the municipality would still be entitled to summary judgment. To begin, plaintiffs have not alleged a custom or policy that is actionable under § 1983. An allegation of failure to train "can only yield liability against a municipality where the city's failure to train reflects a deliberate indifference to the constitutional rights of its inhabitants." *City of Canton v. Harris*, 489 U.S. 378, 390, 109 S.Ct. 1197, 1206, 103 L.Ed.2d 412 (1989); *Palmquist v. Selvik*, 111 F.3d 1332, 1344–46 (7th Cir.1997). TRI–COM's policy, on its face, is not "deliberately indifferent" to the rights of its citizens, nor does it authorize

unconstitutional behavior. It is doubtful whether there is a deficiency in TRI–COM's policy at all, since the instruction to the dispatcher to inquire about whether anyone has any weapons implies that the dispatcher should communicate that information to the police officers on the scene. Additionally, other than the single incident alleged here, plaintiffs have produced no evidence of a dispatcher committing a constitutional violation. "Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell,* unless proof of the incident also includes proof that it was caused by an existing, unconstitutional municipal policy." *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823–24, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985).

Furthermore, plaintiffs' allegations against TRI–COM suffer from the same deficiency as their claim against dispatcher Kreibach—plaintiffs have not demonstrated the causal nexus between the municipality's policy or custom and the alleged injuries. *See City of Canton, Ohio v. Harris,* 489 U.S. 378, 389–92, 109 S.Ct. 1197, 1206, 103 L.Ed.2d 412 (1989) ("the identified deficiency in the city's training program must be closely related to the ultimate injury"); *Tuttle,* 471 U.S. at 824 n. 8, 105 S.Ct. at 2436 n. 8 ("[t]here must at least be an affirmative link between the training inadequacies alleged, and the particular constitutional violation at issue" to satisfy the policy or custom requirement of *Monell* ). TRI–COM's policies apply only to its own employees. However, it was Officer Kijowski, not dispatcher Kreibach, who fired the shots at Michael Frane. Plaintiffs' claims are too attenuated, in that they cannot show that Officer Kijowski would have acted differently had Kreibach given him the information regarding the BB gun. Thus, there is no evidence on the record that the dispatchers' training was the proximate cause of Michael Frane's injuries.

### SUPPLEMENTAL STATE CLAIMS

Having dismissed plaintiff's federal claims, the court is left with state law claims of battery and willful and wanton misconduct against Officer Kijowski. To minimize federal involvement in matters of state law, when federal claims are dismissed before trial, the court generally does not retain jurisdiction over supplemental state law claims. *Olive. Can Co. v. Martin,* 906 F.2d 1147, 1153 (7th Cir.1990). Thus, the remaining state law claims are dismissed without prejudice for lack of subject matter jurisdiction pursuant to 28 U.S.C. § 1367(c) (1995).

### *CONCLUSION*

This case arose out of an unfortunate coincidence of circumstances. But, there is no evidence on the record from which a reasonable trier of fact could conclude that these defendants violated plaintiffs' constitutional rights. Therefore, the court grants defendants Kijowski, Cahill and Simpson's motion to dismiss and Defendants Kreibach, Bleck and TRI–COM's motion for summary judgment. Judgment is entered in favor of defendants.

**IT IS SO ORDERED.**